UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Joseph LaRosa & <br> Emilie LaRosa, h/w <br> 2422 S. 9th Street <br> Philadelphia. PA 19148 <br><br> *Plaintiffs,* <br><br> *v.* <br><br> 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., TYCO FIRE PRODUCTS L.P., CHEMGUARD, INC., BUCKEYE FIRE EQUIPMENT COMPANY, NATIONAL FOAM, INC., KIDDE-FENWAL, INC., DYNAX CORPORATION, E.I. DU PONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, L.L.C., CORTEVA, INC., and DUPONT DE NEMOURS, INC. <br><br> *Defendants.* | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | **COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** <br><br> **CASE NO.:** 2:20-cv-00546-RMG |

Plaintiffs, Joseph LaRosa and Emilie LaRosa ("Plaintiffs"), by and through Plaintiffs' attorneys, as and for Plaintiffs' complaint against Defendants, 3M Company, f/k/a Minnesota Mining and Manufacturing Co., Tyco Fire Products L.P., Chemguard, Inc., Buckeye Fire Equipment Company, National Foam, Inc., Kidde-Fenwal, Inc., Dynax Corporation, E.I. du Pont De Nemours and Company, The Chemours Company, The Chemours Company FC, L.L.C., Corteva, Inc., and DuPont de Nemours, Inc. (collectively "Defendants"), allege as follows:

## INTRODUCTION

1.      Plaintiffs bring this action against Defendants for personal injury damages because Plaintiff's drinking water and the water of surrounding towns and municipalities was, is and has been contaminated by chemicals Defendants manufactured.

2.      Defendants manufactured a product that contaminated and continues to contaminate the environment, yet no Defendant included user warnings to protect the environment or innocent bystanders.

3.      For decades, the Defendants manufactured and sold AFFF and/or PFAS constituents in AFFF for use in AFFF to the U.S. Navy and the Pennsylvania Air National Guard for use on ships and at military bases, including the former Willow Grove Naval Air Station Joint Reserve Base in Horsham Township, Pennsylvania (the "Willow Grove Base"), and the former Naval Air Warfare Center in Warminster Township, Pennsylvania (the "Warminster Base"). (The Willow Grove Base and the Warminster Base are collectively referred to as the "Bases.")

4.      The Defendants manufactured AFFF that contained "fluorocarbon surfactants," believed to include PFOS, PFOA, and/or certain other perfluorinated compounds ("PFCs") that degrade into PFOS or PFOA. (PFOS, PFOA and the PFCs that degrade into PFOS or PFOA are hereinafter referred to as "Toxic Surfactants.") The Defendants' precise compositions and formulas for their AFFF during the relevant period have not been made public.

5.      When consumed, PFOS and PFOA have been linked to numerous and serious health issues.

6.      Residents in the area near the Bases, including Plaintiff, Joseph LaRosa, while he resided in the area, obtained and continue to obtain their drinking water predominantly from groundwater pumped from either municipal or private wells.

7.      For decades, residents near the Bases and their children have been drinking, and eating food prepared with, water laced with dangerous chemicals, namely, perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA").

8.      As the manufacturers of AFFF, the Defendants knew or should have known that the inclusion of Toxic Surfactants in AFFF presented an unreasonable risk to human health and the environment.

9.      Nonetheless, Defendants marketed and sold their products with the full knowledge that large quantities of Toxic Surfactant-laden AFFF would be used in training exercises and in emergency situations in such a manner that the dangerous chemicals would be introduced, in large quantities, into the environment.

10.      For years, Plaintiff, Joseph LaRosa, was exposed to and have ingested PFOS and PFOA at extremely high and dangerous levels.

11.      Plaintiff, Joseph LaRosa. had no way to know that he were consuming water and food contaminated with PFOS and PFOA until the contamination was disclosed to him by local, and/or state and/or federal officials and/or the news media.

## PARTIES

### Plaintiff

12.      Plaintiffs, Joseph LaRosa ("Joseph") and Emilie ("Emilie") LaRosa, are husband and wife and are citizens of the Commonwealth of Pennsylvania, who reside at 2422 S. 9th Street, Philadelphia. PA 19148.

13.     This complaint arises out of and relates to the original filing by Writ of Summons on behalf of Plaintiff, Joseph LaRosa, in the Court of Common Pleas, County of Montgomery, Commonwealth of Pennsylvania on October 24, 2017 at Docket No. 2017- 25365 and captioned *Oerth, et al. v. 3M et al.*

14.     Plaintiff's, Joseph, water supply was contaminated with PFOS and PFOA.

15.     As a result of Plaintiff's, Joseph, exposure to drinking water contaminated with PFOS and PFOA, said Plaintiff was diagnosed with the injuries and/or diseases and/or bruises and/or scarring and/or contusions as stated herein, *infra*.

**Defendants**

16.     Defendant The 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

17.     At all times relevant, 3M designed, manufactured, marketed, promoted distributed and/or sold AFFF containing PFOA and/or PFOS used to fight fires at numerous military bases and other locations throughout the United States and its territories and holdings.

18.     Beginning before 1970 and until at least 2002, 3M manufactured, marketed, promoted and sold AFFF containing PFCs that included, but is not limited to PFOA and/or PFOS.

19.     Defendant, 3M, designed, distributed, manufactured and sold AFFF containing PFAS and/or PFOS constituents in AFFF that was used at the bases.

20.     Defendant Tyco Fire Products LP (hereinafter "Tyco") is a limited partnership organized and existing under the laws and statutes of the state of Delaware, having a principal place of business at One Stanton Street, Marinette, WI 54143. Tyco does business throughout the United States, its territories and holdings, including Pennsylvania.

4

21.     Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul") (hereinafter Ansul and/or Tyco as successor-in-interest to Ansul are referred to collectively as "Tyco/Ansul").

22.     At all times relevant hereto, Tyco/Ansul designed, distributed, manufactured and/or sold fire suppression products, including AFFF, that contained fluorocarbon surfactants containing PFCs.

23.     Beginning in or around 1975, Ansul designed, distributed, manufactured and/or sold AFFF that contained PFCs that included, but is not limited to PFOA and PFOS.

24.     After Tyco acquired Ansul in 1990, Tyco/Ansul continued to design, distribute, manufacture and/or sell AFFF that contained PFCs that included, but is not limited to PFOA and PFOS.

25.     Tyco/Ansul designed, distributed, manufactured and/or sold AFFF containing PFAS and/or PFOS constituents in AFFF that was used at the Bases.

26.     At all times relevant, Tyco and/or Ansul manufactured fire suppression products, including AFFF that contained fluorocarbon surfactants.

27.     Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation, organized under the laws of the state of Ohio with its principal place of business at 110 Kings Road, Kings Mountain, NC  28086. Buckeye does business throughout the United States, its territories and holdings, including Pennsylvania.

28.     At all times relevant, Buckeye designed, distributed, manufactured and/or sold AFFF that contained PFCs that included, but is not limited to PFOA and PFOS and other toxic substances.

29.     At all times relevant hereto, Buckeye designed, distributed, manufactured and/or sold AFFF containing PFAS and/or PFOS constituents in AFFF that was used at the Bases.

30.     Chemguard (Chemguard) is a Texas corporation, organized under the laws of Texas having a principal place of business at One Stanton Street, Marinette, WI 54143. Chemguard does business throughout the United States, its territories and holdings, including Pennsylvania.

31.     At all times relevant hereto, Chemguard designed, distributed, manufactured marketed, promoted and/or sold AFFF that contained PFCs that included, but is not limited to PFOA and PFOS and other toxic substances.

32.     At all times relevant hereto, Chemguard designed, distributed, manufactured marketed, promoted and/or sold AFFF that contained PFCs that included, but is not limited to PFOA and PFOS and other toxic substances that were used at the Bases.

33.     National Foam, Inc. (a/k/a Chubb National Foam) (collectively known as "National Foam") is a Delaware corporation organized and existing under the laws of the state of Delaware having a principal place of business at 141 Junny Road, Angier, North Carolina 27501.

34.     National Foam is the successor-in-interest to Angus Fire Armour Corporation and manufactures the Angus brand of products. National Foam does business throughout the United States, its territories and holdings, including Pennsylvania. References to "National Foam" herein shall refer to AFFF designed, distributed, manufactured marketed, promoted and/or sold under the "Angus" name/brand and "Angus Fire" name/brand.

35.     At all times relevant, National Foam designed, distributed, manufactured marketed, promoted and/or sold fire suppression products, including AFFF that contained fluorocarbon surfactants containing PFCs.

36.     At all times relevant hereto, National Foam designed, distributed, manufactured and/or sold AFFF containing PFAS and/or PFOS constituents in AFFF that was used at the Bases.

37.     Defendant Kidde-Fenwal, Inc. ("Kidde"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101. Kidde is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.). Kidde does business throughout the United States, its territories and holdings, including Pennsylvania..

38.     Kidde designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

39.     Defendant Dynax Corporation ("Dynax") is a Delaware Corporation organized and existing under the laws of the state of Delaware with a principal place of business is 103 Fairview Park Drive Elmsford, New York, 10523-1544 Dynax does business throughout the United States, its territories and holdings, including Pennsylvania.

40.     In 1991, Dynax Corporation entered the AFFF business, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

41.     Defendant E.I. du Pont De Nemours & Co. is a Delaware Corporation organized and existing under the laws of the state of Delaware with a principal place of business at 974 Centre Road, Wilmington Delaware 19805 and does business throughout the United States, its territories and holdings, including Pennsylvania.

42.     E.I. du Pont De Nemours & Co. designed, distributed, manufactured promoted, marketed and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

43.     Defendant, The Chemours Company, is a Delaware Corporation organized and existing under the laws of the state of Delaware and conducts business throughout the United States, its territories and holdings, including Pennsylvania.  Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19899.

44.     The Chemours Company designed, distributed, manufactured promoted,  marketed and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

45.     The Chemours Company was incorporated as a subsidiary of E.I. du Pont De Nemours & Co. as of April 30, 2015. From that time until July 2015, The Chemours Company was a wholly owned subsidiary of E.I. du Pont De Nemours & Co. In July, 2015, E.I. Du Pont de Nemours & Co. spun off The Chemours Company and transferred to The Chemours Company its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of The Chemours Company stock to E.I. du Pont De Nemours & Co. stockholders, and The Chemours Company has since been an independent, publicly traded company.

46.     Defendant The Chemours Company FC, L.L.C. is a Delaware Corporation and conducts business throughout the United States its territories and holdings, including conducting business in Pennsylvania.  Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19899.

47.     The Chemours Company FC, L.L.C. designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

48.     The Chemours Company and The Chemours Company FC, LLC are collectively referred to throughout this Complaint as "Chemours."

49.     E.I. du Pont De Nemours & Co. merged with The Dow Chemical Company in August 2017 to create DowDuPont Inc. (DowDuPont). E.I. du Pont De Nemours & Co. and The

Dow Chemical Company each merged with wholly owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont. Since that time, DowDuPont has affected a series of separation transactions to separate its businesses into three independent, publicly traded companies for each of its agriculture, materials science, and specialty products businesses, discussed below.

50.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware. Corteva Inc. does business throughout the United States its territories and holdings, including conducting business in Pennsylvania.

51.     Corteva designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

52.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva, Inc.

53.     Corteva, Inc. was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly owned subsidiary of DowDuPont.

54.     On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva, Inc. common stock by way of a pro rata dividend. Following that distribution, Corteva, Inc. is the direct parent of E. I. du Pont de Nemours & Co. and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

55.     Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont Inc.) is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. DuPont de Nemours, Inc. does business throughout the United States, including conducting business in Pennsylvania.

56.     DuPont de Nemours, Inc. designed, distributed, manufactured and/or sold AFFF-containing PFAS and/or PFAS constituents in AFFF that was used at the Bases.

57.     On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva, Inc. and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont (New DuPont). New DuPont retained assets in the specialty products business lines following the above described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva, Inc.

58.     Defendants E. I. du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

59.     Some or all of the AFFF manufactured and sold by the Defendants contained fluorosurfactants manufactured and sold by DuPont.

60.     3M Company; Tyco Fire Products L.P; Chemguard, Inc.; Buckeye Fire Equipment Company; National Foam, Inc.; Kidde-Fenwal, Inc.; Dynax, Inc.; E.I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont."

61.     Defendants, among other things: (a) designed, manufactured, formulated, promoted, marketed, sold, and/or otherwise supplied (directly or indirectly) PFAS-containing AFFF and/or PFAS constituents in AFFF and/or PFAS for use in AFFF that was delivered into areas affecting Plaintiff's water supply, such that AFFF-related PFAS and/or PFAS constituents in AFFF have contaminated Plaintiff's water supply; (b) acted with actual or constructive knowledge that PFAS-containing AFFF and/or PFAS constituents in AFFF and/or PFAS for use in AFFF would be delivered into areas affecting Plaintiff's water supply; (c) are legally responsible

10

for and committed each of the multiple tortious and wrongful acts alleged in this Complaint; and (d) promoted PFAS-containing AFFF and/or PFAS constituents in AFFF and/or PFAS for use in AFFF, despite the availability of reasonable alternatives and their actual or constructive knowledge that the contamination alleged in this Complaint would be the inevitable result of their conduct.

62.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

63.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

## Jurisdiction and Venue

64.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are diverse and the amount in controversy exceeds $75,000.

65.     Plaintiff is direct-filing this Complaint in the United States District Court for the District of South Carolina as permitted by Case Management Order No.3 entered by this Court in In Re: Aqueous Film-Forming Foams Products Liability Litigation, MDL No. 2:18-mn-2873-RMG.

66.     The United States District Court for the Eastern District of Pennsylvania is the proper venue of origin where Plaintiff's claims could have otherwise been brought pursuant to 28 U.S.C. § 1391.

67.     The United States District Court for the Eastern District of Pennsylvania is the proper "Home Venue" because, based on information and belief, each Defendant is a corporation or other business that has sufficient minimum contacts in Pennsylvania or otherwise intentionally avails itself of the Pennsylvania market either through the distribution or sale of AFFF products in the Commonwealth of Pennsylvania so as to render the exercise of jurisdiction over it by this Court consistent with traditional notions of fair play and substantial justice.

68.     Further, Venue is also proper in the United States District Court for the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b)(2) because the events, omissions, and harms that are the basis of Plaintiff's claims occurred in substantial part in this judicial district.

69.     Plaintiff brings causes of action based solely on and arising under Pennsylvania Law. The claims of Plaintiff are for violations of Pennsylvania law that occurred exclusively in the Commonwealth of Pennsylvania.

## GENERAL FACTUAL ALLEGATIONS

### A.     PFOA and PFOS, Their Chemical Characteristics, and Risk in Groundwater

70.     Poly and perfluroalkyl substances (collectively "PFAS compounds") are terms used to describe a group of organic flurorinated alkanes.

71.     PFCs are manmade chemicals that do not exist in nature.

72.     There are numerous chemicals in the PFC family, two of which are PFOS and PFOA.

73.     PFOS and PFOA have also been widely used in industry and in commercial products due to their quality to repel water, dirt, oil, and grease.

74.     Companies also used PFOS, PFOA and other Toxic Surfactants specifically to commercially make AFFF.

75.    PFOS and PFOA have unique properties that make them persistent, bioaccumulative, and toxic.

76.    First, PFOS and PFOA can persist in the environment.

77.    Due to the strength of multiple carbon-fluorine bonds, PFOS and PFOA break down very slowly in the environment, if at all.

78.    PFOS and PFOA are thermally, chemically, and biologically stable and resistant to biodegradation, atmospheric photooxidation, direct photolysis, and hydrolysis.

79.    PFOS and PFOA are also water soluble, making them mobile in groundwater and the environment, and because they repel organic materials, they readily leach through soil impacting groundwater.

80.    Typical municipal water treatment plants did not and do not filter PFOS and PFOA from contaminated water due to the chemicals' physical and chemical properties.

81.    Similarly, chlorine and other disinfectants that are typically added to municipal drinking water systems did not and do not remove PFOS or PFOA from contaminated water.

82.    Second, PFOS and PFOA are bioaccumulative.

83.    Toxicology studies show that PFOS and PFOA are readily absorbed after oral exposure and accumulate primarily in the serum, kidney, and liver.

84.    PFOS and PFOA have a half-life within the human body of 2 to 9 years.

85.    PFOS and PFOA can bioaccumulate up the food chain; can cross the placenta from mother to fetus; and can be passed to infants through breast milk.

86.    Third, PFOS and PFOA are toxic.

87.    There are a number of health risks associated with exposure to PFOS and PFOA, and these risks are present even when PFOS and PFOA are ingested at seemingly low levels.

88.     PFOS and PFOA contamination presents a significant threat to public health and welfare. PFOA is readily absorbed in the human body after consumption or inhalation and accumulates primarily in the blood stream, kidney and liver. Studies have shown that exposure to fluorochemicals that contain eight or more carbons ("C8"), such as PFOS and PFOA, may cause, including, but not limited to: kidney Cancer, testicular Cancer and liver damage in adult humans as well as developmental effects to fetuses during pregnancy or to breast-fed infants, including low birth weight, accelerated puberty and skeletal variations.

89.     There have also been studies linking C8 with, including, but not limited to: autoimmune and endocrine disorders/diseases, elevated cholesterol, increased liver enzymes, decreased vaccination response, thyroid disease and pregnancy induced hypertension and preeclampsia (a serious pregnancy complication). These injuries may arise within months or years after exposure to PFOA and/or PFOS.

90.     Under the United States Environmental Protection Agency's ("EPA") Guidelines for Carcinogen Risk Assessment, there is "Suggestive Evidence of Carcinogenic Potential" for PFOS and PFOA in humans.[1]

91.     exposure is associated with, among other injuries, increased risk in humans of cancer, including, but not limited to: kidney Cancer, testicular Cancer and physical injuries, diseases and disorders including, but not limited to: liver damage, thyroid disease, high cholesterol, ulcerative colitis, and pregnancy-induced hypertension.

92.     Injuries occur months or years after exposure to PFOS and/or PFOA.

---

[1] U. S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, Drinking Water Health Advisory for Perfluorooctanic Acid (PFOA) (May 2016), https://www.epa.gov/sites/production/files/2016-05/documents/pfoa_health_advisory_final-plain.pdf.

**B. Defendants' History of Production of PFOA/PFOS and Commercialization of AFFF**

93.    Defendant, 3M, in the 1940's, began producing PFOA as part of a process called electrochemical fluorination (ECF). This process results in a product that contains and/or breaks down into compounds including: PFOA and/or PFOS.

94.    For most of the past 30 years, the primary manufacturer of PFOS and PFOA has been Defendant, 3M, through its supply of AFFF.

95.    AFFFs are synthetically formed by combining fluorine free hydrocarbon foaming agents with highly fluorinated surfactants. When mixed with water, a solution forms producing aqueous film that spreads across the surface of a hydrocarbon fuel. The film formation feature is what provides the fire extinguishment.

96.    Defendant, 3M, designed, distributed, manufactured marketed, promoted and/or sold AFFF and the raw materials for production of AFFF from the 1960s to the early 2000s.

97.    Defendants, National Foam and Tyco/Ansul began to design and/or distribute and/or manufacture and/or  market and/or promote and/or sell AFFF in the 1970s.

98.    Defendants, Angus Fire and Chemguard began to design and/or distribute and/or manufacture and/or  market and/or promote and/or sell AFFF in the 1990s.

99.    Defendant, Dynax, began to design and/or distribute and/or manufacture and/or market and/or promote and/or sell raw materials for production of ADDD in the 1990s and became a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in the firefighting foam agents.

100.    Defendant, Buckeye, began to design and/or distribute and/or manufacture and/or market and/or promote and/or sell AFFF in the 2000s.

101.    Beginning in 1951, Defendant, DuPont, began purchasing PFOA from 3M for use in the manufacturing process for its name-brand product Teflon®, commonly known for its use as a coating for non-stick cookware.

102.    In 2000, Defendant, 3M, announces that it would phase out and find replacements for its PFOS chemistry.

103.    In 2001, Defendant, DuPont, became a founding member of the Fire Fighting Foam Coalition ("FFFC").

104.    In part, throughout its involvement in the FFFC, Defendant, DuPont actively marketed its fluorosurfactants to AFFF manufacturers for use in the production of AFFF.

105.    Some or all of the AFFF manufactured and/or sold by the Defendants contained fluorosurfactants manufactured and sold by Defendant, DuPont.

106.    In 1969, the Department of the Navy issued Military Specification MIL-F-24385 for AFFF.

107.    A Military Specification is a document that describes the physical and/or operational characteristics that a product must meet before purchase by the United States military.

108.    That is, in order for an AFFF manufacturer to sell its AFFF to the Navy, it was required to meet Military Specification MIL-F-24385.

109.    MIL-F-24385 covered "the requirements for aqueous film-forming foam (AFFF) liquid concentrate fire extinguishing agents consisting of fluorocarbon surfactants and other compounds" as required to meet certain performance standards that were also set forth in MIL-F-24385.

110.    If a manufacturer demonstrated that its product satisfied MIL-F-24385 performance expectations, then the product was placed on the Department of Defense Qualified Product Listing.

111.    The Defendants herein each manufactured AFFF and/or PFAS constituents in AFFF that was included on the Department of Defense Qualified Product Listing for MIL-F-24385.

112.    In fact, upon information and belief, the Defendants, individually or through predecessor or affiliate companies, were the only companies whose products were included on the Department of Defense Qualified Product Listing for MIL-F-24385-compliant AFFF from the inception of AFFF through the closure of the Warminster Base in 1996.

113.    Further, upon information and belief, 3M, Tyco, and National Foam, together with Buckeye and Chemguard, individually or through predecessor or affiliate companies, were the only companies whose products were included on the Department of Defense Qualified Product Listing for MIL-F-24385-compliant AFFF from the inception of AFFF through the closure of the airfield at the Willow Grove Base in March 2011.

114.    Upon information and belief, each of the Defendants sold AFFF to the Military for use at the Bases.

115.    MIL-F-24385 provided, among other things, that:

The concentrate shall consist of fluorocarbon surfactants plus other compounds as required to conform to the requirements specified hereinafter. **The material shall have no adverse effect on the health of personnel when used for its intended purpose.**

116.    Although MIL-F-24385 required the use of a "fluorocarbon surfactant," it did not specify a particular chemical, such as PFOS, PFOA or another Toxic Surfactant.

117.    The Defendants had the choice to manufacture MIL-F-24385-compliant AFFF with a formula that did not include PFOS, PFOA or another Toxic Surfactant.

118.    For example, upon information and belief, each of the Defendants, except for 3M, which no longer manufactures AFFF, manufactures AFFF today without PFOS, PFOA or another Toxic Surfactant.

119.    Upon information and belief, Defendants had the ability during all relevant times to commercially manufacture AFFF without PFOS, PFOA or another Toxic Surfactant.

120.    Nonetheless, despite their options and their knowledge of the dangers that PFOS and PFOA posed to human health and the environment, upon information and belief, Defendants commercially manufactured AFFF that contained PFOS, PFOA, or another Toxic Surfactant and/or PFAS constituents in AFFF.

121.    By including PFOS, PFOA or another Toxic Surfactant, the AFFF and/or PFAS constituents in AFFF manufactured by Defendants did not meet MIL-F-24385.

122.    Defendants knew or should have known that the products they sold to the military were harmful to human health and the environment and did not meet the requirements of MIL-F-24385.

123.    The Defendants did not timely inform the military that their products did not meet the requirements of MIL-F-24385.

### C.  OTHER DEFENDANT'S KNOWLEDGE OF THE DANGERS OF PFAS

124.    Defendants, Tyco/Ansul, Chemguard, Buckeye, Kidde/Kidde Fire, Dynax and National Foam/Angus Fire, knew or should have known that in their intended and/or common use, their AFFF and/or PFAS products would harm the environment and human health, including , but not limited to causing harm to Plaintiff(s).

125.    Defendants, Tyco/Ansul, Chemguard, Buckeye, Kidde/Kidde Fire, Dynax and National Foam/Angus Fire, knew or should have known that in their intended and/or common use, their AFFF and/or PFAS products would contaminate human water supplies and cause injuries/harm to individuals such as Plaintiff(s).

126.    Information regarding PFAS compounds was readily accessible to Defendants,

Tyco/Ansul, Chemguard, Buckeye, Kidde/Kidde Fire, Dynax and National Foam/Angus Fire, for decades because each is an expert in manufacturing and/or the materials needed to manufacture AFFF and/or the formulation of PFAS constituents in AFFF, and each has detailed information and understanding about the chemical compounds that form AFFF products.

127.    The Firefighting Foam Coalition ("FFC"), an AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability.

128.    Defendant, DuPont, which is described above, had extensive knowledge about toxicity associated with PFAS was a founding member of the FFFC.

129.    All of the Defendants with the exception of 3M were members of the FFFC ("FFFC" Defendants).

130.    Through their involvement in the FFFC, as well as a variety of other trade associations and groups, FFFC Defendants shared knowledge and information regarding PFAS, PFOA, PFOS and other chemical compounds related to derived from PFCs.

131.    The FFFC Defendants worked together to protect AFFF from scrutiny.

132.    Their close cooperation included messaging on PFOA's toxicological profile.

133.    The FFFC's efforts were designed to shield its members and the AFFF industry from the detrimental impact of the public and regulators learning about the harms of PFOA to human health and the environment.

134.    The FFFC Defendants regularly published newsletters and attended conferences bolstering their AFFF products.

135.    These coordinated efforts by the FFFC Defendants were meant to dispel concerns about the impact AFFF had on the environment and human health. They worked in concert to conceal known risks of their AFFF from the government and public.

136. The FFFC Defendants repeated the same message for years: Only one PFAS chemical PFOS, had been taken off the market. Since the FFFC Defendants' products did not contain PFOS, they claimed their products were safe.

137. The FFFC Defendants knew the use of their AFFF products presented a similar threat to human health and the environment.

138. While this was known to the FFFC Defendants, it was not fully understood by the users of the Defendants AFFF products.

139. Through the FFFC Defendants involvement with the FFFC, as well as a variety of other trade associations and groups, the FFFC Defendants shared knowledge and information regarding PFOA.

140. The FFFC Defendants worked together to protect AFFF from scrutiny.

141. The FFFC Defendants close cooperation included , messaging on PFOA's toxicological profile.

142. The efforts of the FFFC were designed to shield its members and the AFFF industry from detrimental impact of the public regulators learning about harms of PFOA to human health and the environment.

143. The FFFC Defendants regularly published newsletters and attended conferences bolstering their AFFF products.

144. These coordinated efforts by the FFFC Defendants were meant to dispel concerns about the impact AFFF had on the environment and human health. They worked in concert to conceal known risks of their AFFFF from the government and public.

145. FFFC Defendants repeated the same message for years: Only one PFAS chemical,

PFOS, had been taken off the market. Since FFFC Defendants products did not contain PFOS, they claimed their products were safe.

146.     FFFC Defendants knew that the use of their AFFF products presented a similar threat to human health and the environment.

147.     While this was known to FFFC Defendants, it was not fully understood by users of the AFFF.

### **AFFF Use at the Willow Grove and Warminster Bases**

148.     At any given time during their operation, the Bases housed and used thousands of gallons of AFFF concentrate manufactured by Defendants, stored in buckets, drums, tanks, tankers, crash trucks and sprinkler systems.

149.     U.S. Navy, Air National Guard, Marines, and Air Force (collectively referred to as "Military") personnel, as well as Federal and  civilian firefighters, conducted training exercises at the Willow Grove and Warminster Bases.

150.     In part, the Military, Federal and civilian firefighters engaged in firefighting, explosion training, and sprinkler system testing that required the use of AFFF.

151.     For decades, firefighting training activities took place at the two military bases.

152.     Each site also possessed and maintained aircraft hangars protected by ceiling sprinkler units holding hundreds of gallons of AFFF.

153.     The use of AFFF for training purposes included suppressing fires and explosions on the ground, clearing hoses, as well as coating runways in anticipation of difficult landings, all of which resulted in acres of foam-covered soil and blanketed wreckages.

154.    Instructions and warning labels affixed to AFFF by the Defendants did not adequately describe the scope of danger associated with storage, use, clean up, and disposal of AFFF, or the procedures necessary for the safe storage, use, clean up, and disposal of AFFF.

155.    Defendants were aware of the health risks associated with use, disposal and bioaccumulation of AFFF components, but, upon information and belief, did not warn the users of the AFFF.

156.    Defendants were aware of the health risks of introducing AFFF into the environment, but, upon information and belief, did not warn the users of the AFFF.

157.    Upon information and belief, at no time during the relevant period did the Defendants warn users of the AFFF that ingredients in the AFFF were persistent, bioaccumulative, and toxic, or that, once introduced into the environment, its chemical components would readily mix with ground and surface water and migrate off the Bases, contaminating the drinking water of the surrounding communities, and exposing tens of thousands of innocent people, including Plaintiff, to water contaminated by their products.

158.    In 2002, 3M ceased production of AFFF manufactured with PFOS due to health and environmental concerns.

159.    3M and the other defendants had known of these dangers for years.

160.    Even though 3M ceased production of PFOS-based AFFF in 2002, neither 3M nor any other Defendant that used manufactured, sold, distributed and/or redistributed a Toxic Surfactant-based AFFF recalled its dangerous products.

**Plaintiff's Discovery of Toxic Chemicals in Plaintiff's Drinking Water**

161.    Prior to 2012, municipal water providers were not required to test their drinking water for the presence of PFOS or PFOA, and tests for PFOS and PFOA were rare.

162.    In 2012, the EPA included PFOS and PFOA in its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), which thereby required certain water providers across the country, including the towns surrounding the Bases, to test their water for the presence of PFOS and PFOA.

163.    Plaintiff has learned that Plaintiff's drinking water was contaminated with dangerous levels of PFOS and/or PFOA.

164.    Plaintiff has since learned that the source of the contamination is the use of AFFF at the Bases; that the Defendants were the only manufacturers of AFFF and/or PFAS for use in AFFF; and that exposure to Defendants' chemicals caused Plaintiff's injuries.

165.    As set forth herein, Defendants knowingly manufactured, sold, and distributed dangerous and defective AFFF and/or PFAS for use in AFFF, failed to provide proper warnings to protect bystanders, such as the Plaintiff, and failed to recall their products when they took them off the market.

**3M's Knowledge of the Dangers of PFAS**

166.    As early as the 1950s, Defendant, 3M, based upon its own internal studies concluded that PFAS were/are "toxic".

167.    As early as the mid-1950s, Defendant, 3M, knew that some PFAS bioaccumulate in humans and animals.

168.    In the early 1960s, Defendant, 3M, knew that some PDAS were/are stable and persist in the environment and that they do not degrade.

169.    As early as 1960, Defendant, 3M, knew that chemical wastes from PFAS manufacturing facilities that were dumped into landfills could leach into groundwater and otherwise enter the environment.

170.     An internal Memorandum form 1960 described Defendant's, 3M, knowledge that such wastes "[would] eventually reach the water table and pollute domestic wells".

171.     As early as 1963, Defendant, 3M, was aware that its PFAS products were stable in the environment and would not degrade after disposal.

172.     Defendant, 3M, began to monitor the blood of its employees for PFAS as early as 1976, because Defendant, 3M, was concerned about health effects of PFAS.

173.     Defendant's, 3M, documents from 1977 relating to these worker tests further confirm that PFAS bioaccumulate.

174.     As early as 1970, Defendant, 3M, knew that its PFAS products were hazardous to marine life.

**Dupont's Knowledge of the Dangers of PFAS**

175.     DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961.

176.     DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

177.     In 1978, based on information it received from 3M about elevated and persistent fluorine levels in workers exposed to PFOA, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure.

178.     This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

179.     By 1979, DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.

24

180.    DuPont did not report this data or the results of its worker health analysis to any government agency or community.

181.    The following year, DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable."

182.    Not only did DuPont know that PFOA accumulates in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

183.    In fact, DuPont had reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but DuPont concealed the results of internal studies of its own plant workers.

184.    While DuPont knew about this toxicity danger as early as the 1960s, DuPont also was aware that PFAS was capable of contaminating the surrounding environment.

185.    Further, no later than 1984, DuPont was aware that PFOA is biopersistent.

186.    DuPont was long aware that the PFAS it was releasing from its facilities was leaching into groundwater used for public drinking water.

187.    After obtaining data on these releases and the consequent contamination near DuPont's plant in West Virginia, DuPont, in 1984, held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

188.    DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials.

189.    DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

25

190.    During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."

191.    They were resigned to DuPont's "incremental liability from this point on if we do nothing" because DuPont was "already liable for the past 32 years of operation."

192.    They also stated that the "legal and medical [departments within DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business, and that these departments had "no incentive to take any other position."

193.    DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.

194.    For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

195.    DuPont knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment in New Hampshire.

**Other Defendant's  Knowledge of the Dangers of PFAS**

196.    Tyco/Ansul, Chemguard, Buckeye, Kidde/Kidde Fire, Dynax, and National Foam/Angus Fire knew, or at the very least should have known, that in their intended and/or common use, their AFFF and/or PFAS products would harm the environment and human health.

197. Tyco/Ansul, Chemguard, Buckeye, Kidde/Kidde Fire, Dynax, and National Foam/Angus Fire knew, or at the very least should have known that, their AFFF and/or PFAS products would injure public drinking water wells.

198. Information regarding PFAS compounds was readily accessible to each of the above-referenced Defendants for decades because each is an expert in the field of AFFF manufacturing and/or the materials needed to manufacture AFFF, and each has detailed information and understanding about the chemical compounds that form AFFF products.

199. The Firefighting Foam Coalition ("FFFC"), an AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability.

200. DuPont, which as is described above had extensive knowledge about the toxicity associated with PFAS, was a member of the FFFC.

201. All of the Defendants, with the exception of 3M, were members of the FFFC ("FFFC Defendants").

202. Through their involvement in the FFFC, as well as a variety of other trade associations and groups, FFFC Defendants shared knowledge and information regarding PFOA.

203. The FFFC Defendants worked together to protect AFFF from scrutiny.

204. Their close cooperation included messaging on PFOA's toxicological profile.

205. The FFFC's efforts were designed to shield its members and the AFFF industry from the detrimental impact of the public and regulators learning about the harms of PFOA to human health and the environment.

206. FFFC Defendants regularly published newsletters and attended conferences bolstering their AFFF products.

207.    These coordinated efforts by the FFFC Defendants were meant to dispel concerns about the impact AFFF had on the environment and human health. They worked in concert to conceal known risks of their AFFF from the government and public.

208.    FFFC Defendants repeated the same message for years: Only one PFAS chemical, PFOS, had been taken off the market. Since the FFFC Defendants' products did not contain PFOS, they claimed their products were safe.

209.    FFFC Defendants knew the use of their AFFF products presented a similar threat to human health and the environment.

210.    While this was known to FFFC Defendants, it was not fully understood by the users of AFFF, the public and Plaintiff.

**1.     Dupont's Spinoff of Chemours**

211.    In February 2014, DuPont formed The Chemours Company as a wholly owned subsidiary.

212.    In July 2015, DuPont used Chemours to spin off its "performance chemicals" business line.

213.    At the time of the spinoff, the performance chemicals division consisted of DuPont's Titanium Technologies, Chemical Solutions and Fluorochemicals segments (the "Performance Chemicals Business").

214.    Until the spinoff was complete, Chemours was a wholly owned subsidiary of DuPont. Although Chemours had a separate board, the board was controlled by DuPont employees.

215.    Prior to the spinoff of Chemours, in 2005, DuPont agreed to pay $10.25 million to resolve eight counts brought by the United Stated Environmental Protection Agency ("EPA")

alleging violations of the Toxic Substances Control Act ("TSCA") and the Resource Conservation and Recovery Act ("RCRA") concerning the toxicity of PFAS compounds. At the time, it was the largest such penalty in history.

216.    DuPont also promised to phase out production and use of PFOA by 2015.

217.    Also, in 2005, DuPont settled a class action lawsuit filed on behalf of 70,000 residents of Ohio and West Virginia for $343 million.

218.    Under the terms of the 2005 class action settlement, DuPont agreed to fund a panel of scientists to determine if any diseases were linked to PFOA exposure, to filter local water for as long as C-8 concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.

219.    After 8 years, the C-8 Science Panel found several significant diseases, including cancer, linked to PFOA.

220.    Once the spinoff was complete, seven new members of the Chemours board were appointed, for an eight-member board of directors of the new public company.

221.    The new independent board appointed upon the completion of the spinoff did not take part in the negotiations of the terms of the separation.

222.    In addition to the transfer of assets, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities that Chemours assumed are set forth in the non-public schedules.

223.    Within the publicly available information about the transfer is the fact that Chemours agreed to indemnify DuPont against, and assumed for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all liabilities

relating," "primarily to, arising primarily out of or resulting primarily from, the operation of or conduct of the [Performance Chemicals] Business at any time."

224.     Chemours agreed to indemnify DuPont against and assume for itself the Performance Chemical Business's liabilities regardless of: (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the DuPont group or the Chemours group; and (v) which entity is named in any action associated with any liability.

225.     Chemours agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

226.     Such liabilities were deemed "primarily associated" if DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business..

227.     Chemours also agreed to use its best efforts to be fully substituted for DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

228.     In addition to the assumption of such liabilities, Chemours also provided broad indemnification to DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

229.     The effect of creation of Chemours was to segregate a large portion of DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products.

230. The consolidation of DuPont's performance chemical liabilities has potentially limited the availability of funds arising out of DuPont's liability.

231. As Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [Ohio] MDL could have a material adverse effect on Chemours consolidated financial position, results of operations or liquidity."

232. At the time of the transfer of its Performance Chemicals Business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture of PFAS compounds and products that contain PFAS compounds.

233. Plaintiff's water supply has been, and continue to be, contaminated in varying amounts over time, as a result of Defendants AFFF containing PFAS and/or PFAS for use in AFFF, causing Plaintiff significant injury and damage.

234. Because precise identification of the specific manufacturer of any given AFFF that was the source of PFOA and PFOS found in drinking water supply wells from which Plaintiff drank, is impossible, Plaintiff must pursue all Defendants, jointly and severally, for those indivisible injuries which Defendants have caused Plaintiff to suffer.

235. Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFCs, including PFOS and PFOA, to profit from the use of AFFF-containing PFOA and PFOS, at Plaintiff's expense, to foreseeably contaminate Plaintiff's water supplies, and to attempt to avoid liability for such contamination of the groundwater.

236. Enterprise liability attaches to all Defendants and the liability of each should be assigned according to its percentage of liability for AFFF-containing PFOA and/or PFOS and/or PFAS for use in AFFF at issue in this Complaint. Each of these Defendants participated in a

state-wide and national market for AFFF containing PFOA and/or PFOS and/or PFAS for use in AFFF during the relevant time.

237.    Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortiously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF-containing PFOA and/or PFOS and/or PFAS for use in AFFF.

238.    Enterprise liability attaches to all of the named Defendants for placing defective products into the stream of commerce.

### CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### Joseph LaRosa v. Defendants

### Defective Product - Failure to Warn

239.    Plaintiff hereby incorporates by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if they were set forth at length herein.

240.    At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, or otherwise distributing AFFF.

241.    As manufacturers, sellers, or distributors of a commercial product, the Defendants had a duty to warn of the risks associated with the reasonably foreseeable uses of their products.

242.    As manufacturers, sellers, or distributors of a commercial product, the Defendants had a duty to provide reasonable instructions on the proper and safe use, storage and disposal of their AFFF.

243.    Defendants, as manufacturers, sellers, and distributors of AFFF placed into the stream of commerce, are guarantors of their AFFF.

244.    Defendants knew or should have known that the Toxic Surfactants contained in their AFFF were toxic and carcinogenic and could lead those exposed to these toxic chemicals and/or or their breakdown products to develop serious medical conditions.

245.    Defendants knew or should have known that the foreseeable storage, use and disposal of the AFFF that they manufactured, sold, and distributed had the capacity to enter the water supply, to persist there for decades, and to cause harm to human health and the environment.

246.    Defendants' AFFF was unreasonably dangerous because it was far more dangerous than an ordinary consumer would expect when used, as designed, in its intended or reasonably foreseeable manner.

247.    These risks were not obvious to users of the AFFF, nor were they obvious to military federal and civilian personnel working on the said bases and businesses and residents in the vicinity of the AFFF use, including Plaintiff, who was unwittingly exposed to Defendants' toxic and carcinogenic chemicals in Plaintiff's drinking water.

248.    Plaintiff could not have reasonably discovered the defects and risks associated with AFFF use.

249.    Plaintiff could not protect Plaintiff from exposure to Defendants' AFFF that contains toxic and carcinogenic chemicals.

250.    The Defendants failed to provide warnings to the users that use of Defendants' AFFF could result in the contamination of groundwater and, ultimately, drinking water supplies.

251.    The Defendants failed to provide warnings to the users of the dangers to human health and the environment if their AFFF was permitted to contaminate the groundwater or drinking water supply.

252.    Defendants knew or should have known that the minimal warnings disseminated with their AFFF were inadequate.

253.    At all times relevant to this litigation, Defendants' AFFF reached its intended consumers and users without substantial change in its condition as designed, manufactured, sold, distributed, labeled and marketed by Defendants.

254.    Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the AFFF.

255.    Had Defendants provided adequate instructions and warnings, the contamination of the groundwater, surface water, and drinking water supply with toxic and carcinogenic chemicals would not have occurred.

256.    As a direct and proximate result of Defendants' failure to warn against the likelihood of contamination from their AFFF, the groundwater and drinking water on and around the Bases became contaminated with PFOS and PFOA.

257.    As a direct and proximate result of Defendants' failure to warn of the environmental and health impacts caused by their AFFF, the drinking water supplies on and around the Bases became contaminated with PFOS and PFOA and have caused personal injury damage to Plaintiff.

258.    Defendants' failure to provide adequate warnings and instructions renders Defendants' AFFF unreasonably dangerous and defective products.

259.    As a result of Defendants' manufacture, sale, or distribution of a defective product, Defendants are strictly liable in damages to the Plaintiff.

260.    As a direct and proximate result of Defendants' placing their defective products into the stream of commerce and failing to warn consumers and users of their products of the near certainty of environmental contamination and the increased risk of the injuries sustained by the

Plaintiff and other medical conditions associated with exposure to PFOS and PFOA as described herein, Plaintiff sustained injuries, diseases, multiple bruises, scarring and contusions to Plaintiff's body, including, but not limited to: Thyroid Cancer and injuries to his muscles, bones, tissues, connective tissues, and nerves, together with severe shock, which injuries may and probably will be permanent as a result of which Plaintiff has, is and will in the future continue to suffer great pain, agony and inconvenience to Plaintiff's great detriment and loss.

261.    As a result of the aforesaid occurrence and injuries Plaintiff sustained, Plaintiff was, has been, and/or will and/or may be prevented from, following Plaintiff's usual occupation sustaining various losses, including, but not limited to: a loss of income, pension, vacation time, health benefits and social security benefit payments to Plaintiff's great detriment and loss.

262.    Solely because of the negligence of the defendants as aforesaid, Plaintiff has been and will be and may be obliged to expend large and various sums of money for medicine and medical attention to treat and cure Plaintiff of the injuries Plaintiff sustained.

263.    Solely because of the negligence of the defendants as aforesaid, Plaintiff has lost the pleasures of life and will be unable to enjoy the pleasures of life.

264.    Plaintiff will continue to suffer these damages and expenses in the future.

265.    Defendants' distribution of their defective products, despite their knowledge of the defects, including the increased risks of widespread contamination of the groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in surrounding areas, such as Plaintiff, among other reasons, demonstrates that Defendants' conduct was willful,  wanton or reckless, and undertaken with a reckless indifference to the rights of Plaintiff.

WHEREFORE, Plaintiff respectfully request that the Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with delay damages, costs herein incurred, attorneys' fees, and all such other and further relief that this Court deems just and proper.

## SECOND CLAIM FOR RELIEF

### Joseph LaRosa v. Defendants

**Defective Product - Design Defect (Consumer Expectations)**

266.    Plaintiff hereby incorporates by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if they were set forth at length herein.

267.    At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, or otherwise distributing AFFF.

268.    As manufacturers, sellers, or distributors, Defendants had a duty to make and/or market AFFF that was free from a defective condition unreasonably dangerous to persons that foreseeably would come into contact with it.

269.    Defendants breached that duty because the AFFF that they manufactured, sold or distributed was dangerous to an extent beyond that contemplated by an ordinary consumer when used in its intended and reasonably foreseeable manner.

270.    Defendants, as manufacturers, sellers, and distributors of AFFF placed into the stream of commerce, are guarantors of their AFFF.

271.    Defendants knew or should have known that the Toxic Surfactants contained in their AFFF was/were toxic and carcinogenic and could lead those exposed to these toxic chemicals and/or or their breakdown products to develop serious medical conditions.

2:20-cv-00546-RMG       Date Filed 02/04/20       Entry Number 1       Page 37 of 50

272.    Defendants knew or should have known that the foreseeable storage, use and disposal of the AFFF that they manufactured, sold, and distributed had the capacity to enter the water supply, to persist there for decades, and to cause harm to human health and the environment.

273.    Defendants' AFFF was far more dangerous than an ordinary user and/or consumer would expect when used, as designed, in its intended or reasonably foreseeable manner.

274.    Defendants' AFFF was, therefore, unreasonably dangerous.

275.    The risks of AFFF were not obvious to users of the AFFF, nor were they obvious to residents in the vicinity of the AFFF use, including Plaintiff, who was unwittingly exposed to Defendants' toxic and carcinogenic chemicals in Plaintiff's drinking water.

276.    Plaintiff could not have reasonably discovered the defects and risks associated with AFFF use.

277.    Plaintiff could not protect Plaintiff from exposure to Defendants' toxic and carcinogenic chemicals.

278.    The Defendants' AFFF was in a defective condition unreasonably dangerous because it was dangerous to an extent beyond that contemplated by an ordinary user and/or consumer when used in its intended and reasonably foreseeable manner.

279.    Defendants' AFFF was, therefore, defective.

280.    It was foreseeable that toxic chemicals from the AFFF that Defendants manufactured, sold and distributed would enter the water supply of the Plaintiff and cause harm to Plaintiff.

281.    As a result of Defendants' manufacture, sale or distribution of a defectively designed product, Plaintiff's drinking water supply became contaminated with dangerous and toxic chemicals and damaged the Plaintiff.

282.    As a result of Defendants' manufacture, sale, or distribution of a defective product, Defendants are strictly liable in damages to the Plaintiff.

283.    As a direct and proximate result of Defendants' manufacture, sale or distribution of a defective product, the drinking water supplies in and around the Bases became contaminated with PFOS and PFOA and have caused personal injury damage to Plaintiff.

284.    As a direct and proximate result of Defendants' placing their defective products into the stream of commerce and failing to warn consumers and users of their products of the near certainty of environmental contamination and the increased risk of the injuries sustained by the Plaintiff and other medical conditions associated with exposure to PFOS and PFOA as described herein, Plaintiff sustained injuries, diseases, multiple bruises, scarring and contusions to Plaintiff's body, including, but not limited to: Thyroid Cancer and injuries to his muscles, bones, tissues, connective tissues, and nerves, together with severe shock, which injuries may and probably will be permanent as a result of which Plaintiff has, is and will in the future continue to suffer great pain, agony and inconvenience to Plaintiff's great detriment and loss.

285.    As a result of the aforesaid occurrence and injuries Plaintiff sustained, Plaintiff was, has been, and/or will and/or may be prevented from, following Plaintiff's usual occupation sustaining various losses, including, but not limited to: a loss of income, pension, vacation time, health benefits and social security benefit payments to Plaintiff's great detriment and loss.

286.    Solely because of the negligence of the defendants as aforesaid, Plaintiff has been and will be and may be obliged to expend large and various sums of money for medicine and medical attention to treat and cure Plaintiff of the injuries Plaintiff sustained.

287.    Solely because of the negligence of the defendants as aforesaid, Plaintiff has lost the pleasures of life and will be unable to enjoy the pleasures of life.

288.     Defendants' distribution of their defective products, despite their knowledge of the defects, including the increased risks of widespread contamination of the groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in surrounding areas, such as Plaintiff, among other reasons, demonstrates that Defendants' conduct was willful, wanton or reckless, and undertaken with a reckless indifference to the rights of Plaintiff.

WHEREFORE, Plaintiff respectfully request that the Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with delay damages, costs herein incurred, attorneys' fees, and all such other and further relief that this Court deems just and proper.

## THIRD CLAIM FOR RELIEF

### Joseph LaRosa v. Defendants

### Defective Product - Design Defect (Risk-Utility)

289.     Plaintiff hereby incorporates by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if they were set forth at length herein.

290.     At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, or otherwise distributing AFFF.

291.     As manufacturers, sellers, or distributors, Defendants had a duty to make and/or market AFFF that was free from a defective condition unreasonably dangerous to persons that foreseeably would come into contact with it.

292.     Defendants' AFFF was defectively designed and manufactured when it left the hands of Defendants, such that the foreseeable risks associated with the use, storage, and disposal of the AFFF exceeded the alleged benefits associated with its design and formulation.

293.     At all relevant times, Defendants' AFFF created significant risks to the environment and to human health, including Plaintiff's health, which far outweighed its utility.

294.     It was foreseeable that toxic chemicals from the AFFF that Defendants manufactured, sold and distributed would enter the water supply of the Plaintiff and cause harm to Plaintiff.

295.     As a result of Defendants' manufacture, sale or distribution of a defectively designed product, Plaintiff's drinking water supply became contaminated with dangerous and toxic chemicals and damaged the Plaintiff.

296.     Alternative designs of AFFF were available, technologically feasible and practical, and would have reduced or prevented the harm to Plaintiff.

297.     For example, all of the Defendants, except for 3M, developed alternative formulations of AFFF that do not contain Toxic Surfactants and that these Defendants claim are as effective as their prior formulations, but are safer for human health and the environment.

298.     Upon information and belief, Defendants' current formulations were technologically feasible during the relevant period.

299.     A reasonable alternative design would, at a reasonable cost, have reduced or eliminated the foreseeable risks of harm posed by AFFF.

300.     The AFFF manufactured, sold, or distributed by the Defendants was defective in design because the foreseeable risk of harm posed by the AFFF could have been reduced or eliminated by the adoption of a reasonable alternative design.

301.     At all times relevant to this litigation, Defendants' AFFF reached its intended consumers and users without substantial change in its condition as designed, manufactured, sold, distributed, labeled and marketed by Defendants.

302.    As a direct and proximate result of Defendants' placing their defective products into the stream of commerce and failing to warn consumers and users of their products of the near certainty of environmental contamination and the increased risk of the increased risk of the injuries sustained by the Plaintiff and other medical conditions associated with exposure to PFOS and PFOA as described herein, Plaintiff sustained injuries, diseases, multiple bruises, scarring and contusions to Plaintiff's body, including, but not limited to: Thyroid Cancer and injuries to his muscles, bones, tissues, connective tissues, and nerves, together with severe shock, which injuries may and probably will be permanent as a result of which Plaintiff has, is and will in the future continue to suffer great pain, agony and inconvenience to Plaintiff's great detriment and loss.

303.    As a result of the aforesaid occurrence and injuries Plaintiff sustained, Plaintiff was, has been, and/or will and/or may be prevented from, following Plaintiff's usual occupation sustaining various losses, including, but not limited to: a loss of income, pension, vacation time, health benefits and social security benefit payments to Plaintiff's great detriment and loss.

304.    Solely because of the negligence of the defendants as aforesaid, Plaintiff has been and will be and may be obliged to expend large and various sums of money for medicine and medical attention to treat and cure Plaintiff of the injuries Plaintiff sustained.

305.    Solely because of the negligence of the defendants as aforesaid, Plaintiff has lost the pleasures of life and will be unable to enjoy the pleasures of life.

306.    Plaintiff will continue to suffer these damages and expenses in the future.

307.    Defendants' distribution of their defective products, despite their knowledge of the defects, including the increased risks of widespread contamination of the groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in the surrounding areas, such as Plaintiff, among other reasons,

demonstrates that Defendants' conduct was willful, wanton or reckless, and undertaken with a reckless indifference to the rights of Plaintiff.

WHEREFORE, Plaintiff respectfully request that the Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with delay damages, costs herein incurred, attorneys' fees, and all such other and further relief that this Court deems just and proper.

## FOURTH CLAIM FOR RELIEF

### Joseph LaRosa v. Defendants

### Negligence

308.    Plaintiff hereby incorporates by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if they were set forth at length herein.

309.    The Defendants had a duty to manufacture, market, and sell their AFFF in a manner that avoided harm to those who foreseeably would come into contact with it.

310.    Defendants knew or should have known that the manufacture of AFFF containing Toxic Surfactants was hazardous to human health and the environment.

311.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture AFFF using Toxic Surfactants because it was a near certainty that the chemicals would migrate off of the Bases and contaminate the ground water and drinking water supply in the surrounding areas.

312.    Defendants knew or should have known that the Toxic Surfactants used in the manufacture of their AFFF do not degrade, remain in the environment for decades, and bioaccumulate, thereby creating a potential health risk that could last for many years.

313.    The Plaintiff was a foreseeable victim of the harm caused by Defendants' AFFF.

314.    As a result of Defendants' breach of their legal duties, the drinking water in and around the Bases, including Plaintiff's drinking water supply, became contaminated with unsafe levels of PFOS and PFOA.

315.    As a result of Defendants' negligent, reckless and/or intentional acts and omissions alleged herein, Plaintiff drinking water supply became contaminated with PFOS and PFOA.

316.    As a result of Defendants' negligent, reckless and/or intentional acts and omissions alleged herein, Plaintiff sustained injuries, diseases, multiple bruises, scarring and contusions to Plaintiff's body, including, but not limited to: Thyroid Cancer and injuries to his muscles, bones, tissues, connective tissues, and nerves, together with severe shock, which injuries may and probably will be permanent as a result of which Plaintiff has, is and will in the future continue to suffer great pain, agony and inconvenience to Plaintiff's great detriment and loss.

317.    As a result of Defendants' negligent, reckless and/or intentional acts and omissions alleged herein, Plaintiff was, has been, and/or will and/or may be prevented from, following Plaintiff's usual occupation sustaining various losses, including, but not limited to: a loss of income, pension, vacation time, health benefits and social security benefit payments to Plaintiff's great detriment and loss.

318.    Solely because of the negligence of the defendants as aforesaid, Plaintiff has been and will be and may be obliged to expend large and various sums of money for medicine and medical attention to treat and cure Plaintiff of the injuries Plaintiff sustained.

319.    Solely because of the negligence of the defendants as aforesaid, Plaintiff has lost the pleasures of life and will be unable to enjoy the pleasures of life.

320.    Defendants' manufacture, marketing, and sale of AFFF, despite their knowledge of the risks of widespread contamination of the groundwater, surface water, and drinking water

supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in the surrounding areas, including Plaintiff, among other reasons, demonstrates that Defendants' conduct was willful, wanton or reckless, and undertaken with a reckless indifference to the rights of Plaintiff.

WHEREFORE, Plaintiff respectfully request that the Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with delay damages, costs herein incurred, attorneys' fees, and all such other and further relief that this Court deems just and proper.

## FIFTH CLAIM FOR RELIEF

## Emilie LaRosa v. Defendants

## Loss of Consortium

321.     Plaintiff, Emilie LaRosa, hereby incorporates by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if they were set forth at length herein.

322.     At all times relevant to Plaintiffs' Complaint Plaintiff, Emilie, and Plaintiff, Joseph, are and were wife and husband.

323.     As a result of the aforesaid, Plaintiff, Emilie, as wife of Plaintiff, Joseph, has been and will be in the future, deprived of the assistance, aid, comfort, companionship, consortium and society of her husband and mate, all of which have been and will be to her great damage, loss and detriment.

324.     As a result of the aforesaid, Plaintiff, Emilie, as wife of Plaintiff, Joseph, has expended and may/will in the future expend various sums of money both for the care and medical attention for her husband and mate.

WHEREFORE, Plaintiff, Emilie LaRosa, respectfully requests that the Court enter judgment in her favor for compensatory and punitive damages, together with delay damages, costs herein incurred, attorneys' fees, and all such other and further relief that this Court deems just and proper.

**SIXTH CLAIM FOR RELIEF**

**Plaintiffs**

**v.**

**E. I. du Pont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc.**

**Violation of Voidable Transactions Act**
**(E. I. du Pont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc.)**

325.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if they were set forth at length herein.

326.    Plaintiffs seek equitable and other relief pursuant to the Voidable Transaction Act (VTA), as adopted by the Commonwealth of Pennsylvania, against E. I. du Pont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc. (collectively the VTA Defendants). 12 Pa. Stat. and Cons. Stat. Ann. § 5101, et seq.

327.    Under the VTA: "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor or the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of

the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." 12 Pa. Stat. and Cons. Stat. Ann. § 5104(a).

328.     The VTA Defendants have (a) acted with actual intent to hinder, delay and defraud parties, and/or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) were engaged or were about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur, debts beyond its ability to pay as they became due.

329.     VTA Defendants engaged in acts in furtherance of a scheme to transfer E. I. du Pont de Nemours and Company's assets out of the reach of parties such as Plaintiffs that have been damaged as a result of the VTA Defendants' conduct, omissions, and actions described in this Complaint.

330.     It is primarily E. I. du Pont de Nemours and Company, rather than The Chemours Company, that for decades manufactured, marketed, distributed and/or sold AFFF containing PFAS and PFAS for use in AFFF with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would contaminate the Plaintiff's, Joseph, drinking water supply and injure the Plaintiff, Joseph.

331.     As a result of the transfer of assets and liabilities described in this Complaint, the VTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF containing PFAS and PFAS for use in AFFF.

46

332.     At the time of the transfer of its Performance Chemicals Business to The Chemours Company, E. I. du Pont de Nemours and Company had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF containing PFAS and/or PFAS compounds for use in AFFF.

333.     The VTA Defendants acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and E. I. du Pont de Nemours and Company believed or reasonably should have believed that The Chemours Company would incur debts beyond The Chemours Company's ability to pay as they became due.

334.     At all times relevant to this action, the claims, judgment and potential judgments against The Chemours Company potentially exceed The Chemours Company's ability to pay.

335.     Pursuant to 12 Pa. Stat. and Cons. Stat. Ann. § 5104(a), Plaintiffs seek avoidance of the transfer of E. I. du Pont de Nemours and Company's liabilities for the claims brought in this Complaint and to the VTA Defendants liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

336.     Plaintiffs further seeks all other rights and remedies that may be available to it under VTA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate Plaintiffs for the damages and injuries Plaintiffs have suffered as alleged in this Complaint.

## **DAMAGES**

337.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

338.     Plaintiffs seek monetary damages for each violation of the First through Sixth Claims for Relief.  In particular, Plaintiffs seek monetary damages:

(i)       to compensate Plaintiffs for the pain and suffering caused by the personal injuries detailed above;

(ii)      to compensate Plaintiffs for medical costs and expenses incurred in the personal injuries detailed above;

(iii)     to compensate Plaintiffs for the medical costs and expenses reasonably anticipated to accrue in the future;

(iv)     to compensate Plaintiffs for the increased costs of water that Plaintiff has borne and will bear as ratepayers as a result of Defendants' conduct;

(v)      for such other monetary damages as are required to fully compensate Plaintiffs for the losses Plaintiffs have and will continue to suffer as a result of Defendants' conduct; and

(vi)     delay damages, including pre-judgment and post-judgment interest according to law.

339.     Plaintiffs seek punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request the Court to enter judgment against the Defendants, as follows:

A.       An award to Plaintiffs of compensatory and punitive damages in an amount to be proven at trial;

B.       An award of attorneys' fees and costs;

C.     Delay damages, including an award of pre-judgment and post-judgment interest, as provided by law; and

D.     Such other and further relief as the Court deems just and proper.

E.     Ordering that the Plaintiffs are entitled to avoid the transfer of E. I. du Pont de Nemours and Company's liabilities to The Chemours Company and put the Plaintiffs in the position they would have been had the transfer not occurred

F.     delay damages, including pre-judgment and post-judgment interest according to law.

340.    Plaintiffs seek punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request the Court to enter judgment against the Defendants, as follows:

A.     An award to Plaintiffs of compensatory and punitive damages in an amount to be proven at trial;

B     An award of attorneys' fees and costs;

C     Delay damages, including an award of pre-judgment and post-judgment interest, as provided by law; and

D     Such other and further relief as the Court deems just and proper.

**Respectfully submitted,**

**Creedon & Feliciani, P. C.**

By: /s/ Joseph L. Feliciani

Joseph L. Feliciani, Esquire
PA Supreme Court I. D. No.: 32357
29 East Marshall Street
Norristown, PA 19401
Telephone No. 610-239-9630
Facsimile No. 610-239-1599
jfeliciani@cflawpc.com

*Attorneys for Plaintiffs*